[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 29, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-13931
Non-Argument Calendar

_____

BIA No. A97-642-891

JULIO CESAR DIAZ,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(April 29, 2008)**

Before BIRCH, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Julio Cesar Diaz, through counsel, seeks review of the order of the Board of

Immigration Appeals ("BIA") affirming the decision of the Immigration Judge ("IJ") denying his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231(b)(3), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c). He argues that the IJ abused his discretion by finding Diaz 1) failed to establish a well-founded fear of persecution, 2) failed to establish a claim for withholding of removal, and 3) was not eligible for withholding of removal and CAT protection. We DENY IN PART and DISMISS IN PART the petition.

## I. BACKGROUND

Diaz, a native and citizen of Colombia, was admitted to the United States in December 1999. In December 2003, the Department of Homeland Security ("DHS") issued Diaz a Notice to Appear ("NTA"), charging that he was subject to removal under 8 U.S.C. § 1227(a)(1)(B), as an alien had who remained in the United States for a time longer than permitted.

Before that, in October 2003, Diaz had filed an administrative application for asylum, withholding of removal, and CAT relief. In that application, Diaz indicated that he sought asylum and withholding of removal based upon his political opinion and membership in a particular social group. Diaz stated that he feared being murdered by the Revolutionary Armed Forces of Colombia ("FARC")

2

"for having refused to cooperate [with them] and due to [his] political work with the Liberal Party." AR at 132. Diaz wrote that he was a member of the Colombian Liberal Party and had "participated in the development of the Children's Home 'The Clown.'" Id. at 133. According to Diaz, he feared being subjected to torture because FARC had declared him a military target, and the Colombian authorities could "not guarantee [his] security and integrity." Id. Diaz explained that he had filed the application more than one year after his arrival in the United States because he had "had a nervous crisis that up to now [he had] not been able to overcome. This crisis prevented [him from] having control over [his] life during these years." Id. at 135. Diaz attached to the application a copy of his birth certificate, passport, and visa. He also attached letters from (1) the president of the Christian Courses Movement of the Archdiocese of Bogota stating that Diaz "was threatened by the guerrilla due to his participation in the political campaigns of the traditional parties"; and (2) the director of the El Payaso[1] Daycare stating that Diaz was threatened and that the militia had tried to recruit him. Id. at 146, 148.

In his application, Diaz further explained that, from January 1997 through November 1998, he "spread the party ideas" at meetings he organized for the parents of children attending the Children's Home. Id. at 138. One Friday, in November 1998, as he left his office, he was approached by FARC members who

---

[1]"El Payaso" means "the clown" in Spanish.

3

forced him to get into their vehicle, placed a hood over his head, and took him to what Diaz believed was a warehouse. These captors told Diaz to abandon his work at the Children's Home and work for them "implementing software to train some of their members; otherwise, [Diaz] would become their enemy." Id. They then returned Diaz to his car and "told [him] that they would keep in touch." Id. After the incident, Diaz continued his normal life, but he ended his visits to the Children's Home. In December, Diaz began to receive threatening calls from FARC. The callers told Diaz that "they needed [his] cooperation immediately." Id. According to Diaz, because he refused to get involved, FARC declared him a military target and told him that "[he] would pay with [his] life." Id. Diaz moved to the city of La Mesa where he was able to establish contacts with friends of the party and continue to manage his company. Diaz wrote that the threatening calls resumed in May 1999, the same month that he left Colombia for the United States for the first time. Diaz explained that he returned to Colombia in November 1999 "to resume [his] life as the threats against [him had] stopped." Id. Two weeks after his return to Colombia, "two individuals riding a motorcycle shot at [Diaz]; fortunately [Diaz] was not injured, the shots hit the vehicle that [he] was driving." Id. Members of FARC called Diaz's mother and told her that Diaz "was going to be murdered because [he] was an enemy of the revolution. At that time, [Diaz] knew that his life was in risk[,] and [he] suffered a nervous crisis." Id. Diaz fled

4

Colombia to the United States.  Diaz also stated in the narrative that his business partner had been murdered in March 2003 for refusing to cooperate with FARC.

Prior to his removal hearing, Diaz filed a motion to waive master calendar hearing and set the cause for an individual hearing.  In that motion, Diaz admitted to the allegations in the NTA and conceded removability.  He also submitted the following documents: (1) a Clinical Background Summary from a psychiatrist; (2) a personal letter from his father; (3) a letter from the legal representative of the Christian Courses Movement of the Archdiocese of Bogota; (4) a letter from the director of El Payaso Daycare; (5) a letter from Libia Hernandez Vargas; (6) a letter from Ignacio Villalobos; and (7) a "Certification of Christian Course and pictures."[2]  Id. at 111.  The undated letter from the psychiatrist specified that Diaz attended his first session in November 1998, because of "threatening phone calls for extortive purposes under the name of an illegal armed group" and was treated until he left the country in May 1999.  Id. at 113.  The psychiatrist stated that Diaz attended another session in November 1999, "showing a severe episode of anxiety because, after his return, he was contacted and harassed again."  Id.  Libia Hernandez Vargas stated that Diaz left due to "political persecution," and Ignacio Villalobos stated that Diaz suffered persecution by FARC.  Id. at 121, 123.

---

[2]The letters from the Archdiocese and the daycare center were the same as those attached to the asylum application.

5

At his removal hearing, Diaz, who was represented by counsel, testified that he had come to the United States in December 1999, but had previously been to the United States in May 1999 as a result of "being persecuted by an urban militia group of the FARC guerrillas." Id. at 81. When Diaz first came to the United States in May 1999, he stayed for about six months before returning to Colombia. He explained that he had not requested asylum at that time because he "thought that everything had gotten over in Colombia, . . . and that's why [he] went back." Id. at 82. Diaz further explained that he waited until 2003 to file his asylum application because he was "suffering a nervous breakdown and . . . was in a very poor condition for a long time." Id. Diaz applied for asylum in 2003 after he learned that his business partner, Adolfo Diaz Cornejo, had been murdered.

In Colombia, Diaz worked as a systems engineer in the development of application software, and he and Cornejo owned a computer company. Diaz stated that, Cornejo "went missing for two days, and[,] at the end of two days, he was found dead." Id. at 90. Cornejo's sister told Diaz that Cornejo was killed by FARC "because of what in Colombia they called the war tax." Id. Diaz testified that in Colombia, he had "help[ed] out at the Colombian Liberal Party" and was a member of the Archdiocese of Bogota with the Christianity [S]eminars." Id. In these capacities, Diaz "organize[d] fairs and festivals . . . to recruit" voters on behalf of the Liberal Party. Id. He also established "kindergartens for low-income

6

family children" and talked with the parents about the differences between the Liberal and Conservative parties. Id. at 91. Diaz did this work from 1997 until November 1998, at which point he stopped after having been detained for 15 minutes by FARC members as he was leaving his office.

According to Diaz's account of the incident, FARC members cut him off, made him get out of his vehicle, placed a hood over his head, and took him to an enclosed area. They wanted two things: (1) that Diaz "stop with the talks, not to speak anymore," and (2) that Diaz cooperate "in some type of software system installation that they wanted." Id. at 92. Diaz did not agree to the demands at that time, but he was allowed to return to his car. Afterwards, in December 1998, FARC members called Diaz and told him that they were waiting for his response. Diaz told them that he had stopped going to the kindergarten and did not want to hear from them again. FARC members called Diaz a couple times in December, but Diaz's father answered the phone. Diaz left Bogota for La Mesa where he stayed until May 1999. At that point, he arranged to come to the United States because FARC members had contacted him in La Mesa and told him that they could not wait any longer. Diaz stated that he believed they were interested in him because they "wanted [him] to stop talking about politics and to work with them in the installation of software." Id. at 96. After the call in La Mesa, Diaz came to the United States, where he stayed until sometime in November.

About two weeks after he returned to Colombia, two individuals on a motorcycle shot at Diaz while he was driving to his office in late November 1999. One of the two shots hit Diaz's car. FARC members called later that evening and told Diaz's mother that Diaz had been declared a military target, and that he "would be executed." Id. at 97. Diaz testified that he was afraid that he would be murdered by FARC if he returned to Colombia.

The IJ again asked Diaz why he waited five years after arriving in the United States to file his asylum application. Diaz explained that he had not intended to stay in the United States until he found out that his business partner had been killed. Diaz told the IJ that FARC was not "trying to collect a war tax from [him]" and, instead, wanted Diaz to "join them." Id. at 105. The IJ asked Diaz why the psychiatrist mentioned in his letter that Diaz was receiving threatening calls for "extortive" purposes, and Diaz stated "they were trying to get me to join them so I would work with them." Id. The IJ asked why the psychiatrist did not mention the attempted murder in the letter, and Diaz explained that he only requested the doctor to provide a medical history. Diaz explained that the people who wrote the other letters knew about his problems with FARC, but did not know the specific details.

In his written order, the IJ denied Diaz's application for asylum, withholding of removal and CAT relief and ordered Diaz removed to Colombia. In his oral

8

decision, the IJ found that Diaz's asylum application was untimely and that Diaz had not shown that he qualified for an exception to the one-year deadline.   On that basis, the IJ found that Diaz was not entitled to asylum.

The IJ then discussed Diaz's initial trip to the United States after Diaz's 1998 kidnapping and the subsequent threatening phone calls he received.  The IJ found that Diaz's "claims that he returned [to Colombia] because he thought that it was safe, . . . [did] not credibly explain why he would have returned if he had been kidnap[p]ed and threatened with calls."  Id. at 43.  The IJ also discussed Diaz's return to the United States after the 1999 incident in which he had been shot at by individuals on motorcycles.  The IJ noted that Diaz had not returned to the United States immediately after the incident, but had instead waited three weeks, and that his corroborating letters failed to mention the shooting incident.  Specifically, the IJ stated, "the respondent has not credibly explained the omission by these two individuals in their letters of a very significant event."  Id. at 45.  For these reasons, the IJ found that Diaz had "failed to show that his life or freedom would be threatened in Colombia on account of race, religion, nationality, membership in a particular social group, or political opinion."  Id.  The IJ further found that Diaz had "not demonstrate[d] a clear probability of persecution on account of one of the enumerated grounds."  Id.  The IJ noted that Diaz had failed to provide a police report to corroborate his claim that FARC tried to kill him in 1999, and had also

9

failed to show that it was more likely than not that he would face persecution on account of one of the statutory grounds. The IJ stated that Diaz's return to Colombia in November 1999 "belie[d] any claim of fear of harm." Id. at 46. Finally, the IJ determined that Diaz was not entitled to CAT relief because Diaz had failed to show that it was more likely than not that he would be tortured if he returned to Colombia.

Diaz filed a notice of appeal, arguing that he ought to have qualified for the exception to the filing deadline and that the IJ erred in his findings about Diaz's claims. In his accompanying brief, Diaz more specifically argued that the IJ erroneously discredited the psychologist's letter for failure to mention the kidnapping because the kidnapping did "not impact the medical diagnosis." Id. at 7. Diaz reasserted that FARC had declared him a military objective because he was active in politics. Based on his testimony that FARC members had told him to discontinue his activities in the community because they went against the FARC movement, Diaz argued that he was entitled to asylum because he was persecuted by FARC based on his political opinion. He pointed out that the IJ had not explicitly made an adverse credibility finding, and further claimed that the IJ improperly failed to consider all of the evidence of record, including the "overwhelming details in [Diaz's] testimony regarding the kidnapping and threatening confrontations with the FARC guerrillas." Id. at 14. Diaz contended

10

that the current country conditions for Colombia supported his claims. Thus, Diaz asserted that his asylum application and his credible testimony established that he had a reasonable well-founded fear of persecution such as to warrant relief.

The BIA dismissed Diaz's appeal, specifically agreeing with the IJ's finding that Diaz's asylum application was untimely and that Diaz did not qualify for an exception to the deadline. The BIA also stated that, "[f]or the other reasons set forth in the [IJ's] decision," it agreed that Diaz had not met his "burden of proving eligibility for withholding of removal or [CAT] protection." Id. at 2.

## II. DISCUSSION

A.      Asylum

In his petition for review, Diaz first argues that the IJ abused his discretion by denying his claim for asylum as untimely. The government argues that we lack jurisdiction to review a denial on this ground. "We review questions of subject matter jurisdiction de novo." Brooks v. Ashcroft, 283 F.3d 1268, 1272 (11th Cir. 2002). Absent "the existence of changed circumstances which materially affect [an] applicant's eligibility for asylum or extraordinary circumstances relating to the delay," asylum applications must be filed within a year of an applicant's arrival in the United States. 8 U.S.C. § 1158(a)(2)(B) & (D). Additionally, "[n]o court shall have jurisdiction to review any determination of the Attorney General [regarding the timeliness of the asylum application or the existence of changed

11

circumstances]." 8 U.S.C. § 1158(a)(3); Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). Thus, we lack jurisdiction to review "a decision regarding whether an applicant complied with the one-year time limit or established extraordinary circumstances that would excuse his untimely filing." Mendoza, 327 F.3d at 1287. Finally, "this rule was not altered by the expansion of jurisdiction in the REAL ID Act." Delgado v. U.S. Att'y Gen., 487 F.3d 855, 860 (11th Cir. 2007) (per curiam).

Diaz failed to comply with the one-year time limit in filing his asylum application. The IJ found none of his justifications sufficient to excuse the untimely filing. Accordingly, we lack jurisdiction to review Diaz's petition with respect to his claim for asylum.

B.     Withholding of Removal

Diaz next argues that he established past persecution on account of his political opinion.[3] Where, as here, the BIA adopts the IJ's decision, we review the

---

[3]The IJ made no explicit adverse credibility finding with regard to Diaz's testimony. Therefore, we accept Diaz's testimony as credible. See De Santamaria v. U.S. Att'y Gen., 512 F.3d 1308, 1320 n.10 (11th Cir. 2008) ("Where an IJ fails to explicitly find an applicant's testimony incredible and cogently explain his or her reasons for doing so, we accept the applicant's testimony as credible").

Also, as an initial matter, Diaz failed to raise, in his brief to the BIA, his claim that he was persecuted on account of his being a software engineer or on account of his membership in the Christianity Seminars. Thus, he has failed to exhaust his administrative remedies as to these issues. For this reason, we lack jurisdiction to consider them. See Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006) (per curiam) ("We lack jurisdiction to consider a claim raised in a petition for review unless the petitioner has exhausted his administrative remedies with respect thereto"); see also 8 U.S.C. § 1252(d)(1) (stating that the exhaustion

12

IJ's decision. Al-Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). Legal determinations are reviewed de novo, and factual findings are reviewed under the substantial evidence test. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). Under the substantial evidence test, we must affirm the decision below "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Antipova v. U.S. Att'y Gen., 392 F.3d 1259, 1261 (11th Cir. 2004) (quotation omitted). "Under this highly deferential standard of review, denial of relief may be reversed only if the evidence would compel a reasonable fact finder to conclude that the requisite fear of persecution exists." Delgado, 487 F.3d at 860.

"An alien is entitled to withholding of removal under the INA if he can show that his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion." Id. at 860-61 (citations omitted); see also 8 U.S.C. § 1231(b)(3). "The alien bears the burden of demonstrating that it is 'more likely than not' [he] will be persecuted or tortured upon being returned to [his] country." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 (11th Cir. 2005) (per curiam) (citation omitted). This standard is more stringent than the "well-founded fear" standard for asylum. Id.

The alien can meet his burden by showing either: (1) "past persecution

requirement applies to immigration cases).

13

in his country based on a protected ground," in which case a rebuttable presumption is created that his life or freedom would be threatened if he returned to his country; or (2) "a future threat to his life or freedom on a protected ground in his country."

Delgado, 487 F.3d at 861 (citation omitted). The government can rebut a presumption that an alien's life or freedom would be threatened if it shows by a preponderance of the evidence "that (1) the country's conditions have changed such that the applicant's life or freedom would no longer be threatened upon his removal; or (2) that the alien could avoid a future threat by relocating to another part of the proposed country of removal," and that such a relocation is a reasonable expectation. 8 C.F.R. § 208.16(b)(1)(i); Mendoza, 327 F.3d at 1287.

"An alien who has not shown past persecution, though, may still be entitled to withholding of removal if he can demonstrate a future threat to his life or freedom on a protected ground in his country." Mendoza, 327 F.3d at 1287; 8 C.F.R. § 208.16(b)(2). An alien may also sustain his burden of proof if he establishes that there is a pattern or practice of persecution of a group of whihc he is a member. 8 C.F.R. § 208.16(b)(2)(i).

We have observed that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." Sepulveda, 401 F.3d at 1231 (quotation omitted). However, we have also said that being shot at constitutes past

14

persecution, even if the attack is unsuccessful.  Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1233 (11th Cir. 2007) ("[A]ttempted murder is persecution."); see also Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1257-58, 1257 n.7 (11th Cir. 2007) (extending the rule in Sanchez Jimenez to other projectiles such as rocks).  "In assessing past persecution we are required to consider the cumulative impact of the mistreatment the petitioner[] suffered."  Mejia, 498 F.3d at 1258; see also, e.g., Ruiz v. Gonzales, 479 F.3d 762, 766 (11th Cir. 2007) (holding that the cumulative effect of a beating, threatening phone calls, and a kidnapping constituted persecution).

To establish a well-founded fear of future persecution, an alien must establish a fear that is both "subjectively genuine and objectively reasonable."  Al Najjar, 257 F.3d at 1289.  "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution."  Id. "[T]he objective prong can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution."  Id. (quotation omitted).  An alien must establish a nexus between his political opinion and the feared persecution and can do so by presenting "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of such an opinion."  See Sepulveda, 401 F.3d at 1231 (addressing an asylum claim). When an applicant fails to "meet the well-founded fear standard for asylum, he is

15

generally precluded from qualifying for either asylum or withholding of deportation." Id. at 1232-33 (alteration omitted).

"If an applicant can show that the persecution was, at least in part, motivated by a protected ground, then the applicant can establish eligibility for withholding of removal." Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006). However, "[p]ersecution on account of . . . political opinion . . . is persecution on account of the victim's political opinion, not the persecutor's." INS v. Elias-Zacarias, 502 U.S. 478, 482, 112 S. Ct. 812, 816 (1992) (internal quotations omitted). We have stated that:

> To qualify for withholding of removal based on persecution by a guerilla group on account of a political opinion, [the alien] must establish that the guerillas persecuted [him] or will seek to persecute [him] in the future because of [his] actual or imputed political opinion. It is not enough to show that [he] was or will be persecuted or tortured due to [his] refusal to cooperate with the guerillas.

Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004) (per curiam) (citations omitted) (holding that the evidence was "consistent with a finding that FARC harassed [the alien] due to her refusal to cooperate with them, which is not enough to qualify for withholding of removal under the INA"). Moreover, "[e]ven if the evidence compels the conclusion that the petitioner refused to cooperate with the guerrillas because of his political opinion, the petitioner still has to establish that the record also compels the conclusion that he has a 'well-founded fear' that

16

the guerrillas will persecute him because of that political opinion, rather than because of his refusal to cooperate with them." Rivera v. U.S. Att'y Gen., 487 F.3d 815, 822 (11th Cir. 2007) (citation and alteration omitted).

Considering the record as a whole, we conclude that substantial evidence supports the IJ's conclusion that Diaz failed to establish past persecution on account of his political opinion. See Antipova, 392 F.2d at 1261. According to Diaz's testimony, FARC kidnapped him in 1998 and told him to (1) stop talking to the parents of the kindergarten children about the differences in the parties, and (2) join FARC in order to install software for them. Thus, the kidnapping incident was motivated, at least in part, by Diaz's political opinion, and therefore qualifies as an incident which might contribute to a finding of persecution. See Tan, 446 F.3d at 1375. Diaz also stated, however, that after the kidnapping incident, he "interrupted" his visits to the Children's Home, and nothing in the record indicates that Diaz continued to "spread the party ideas" once his visits to the Children's Home ended. See AR at 91, 138. Thus, the record does not compel the conclusion that the kidnapping was anything more than one isolated incident of politically-based harassment and intimidation that ended once Diaz told FARC that he had stopped going to the kindergarten. This is insufficient to constitute persecution. See Sepulveda, 401 F.3d at 1231.

Significantly, Diaz explained that he received threatening phone calls from

17

FARC members after the kidnapping because FARC was trying to get Diaz to "join them," and FARC needed his "cooperation." AR at 105, 138. On his asylum application, Diaz explained that he was declared a military target when he refused FARC's request for "cooperation," and that FARC attempted to murder Diaz in December 1999 because he was an "enemy of the revolution." Id. at 138. Although the cumulative effects of a kidnapping, threatening phone calls, and attempted murder can certainly constitute persecution, it is not sufficient to show past persecution when motivated only by FARC's political opinion and Diaz's refusal to cooperate with them. See Sanchez, 392 F.3d at 438; Sanchez Jimenez, 492 F.3d at 1233.[4] Viewing the record as a whole, the evidence is consistent with a finding that, after the initial kidnapping incident, FARC harassed Diaz only because of his refusal to cooperate with them, which is not enough to qualify for withholding of removal. See Sanchez, 392 F.3d at 438.

_____

[4]Diaz's reliance on Sanchez Jimenez, with regard to the shooting, is misguided because Diaz failed to provide any documentary evidence to corroborate his claim, about which the IJ found his testimony standing alone to be unconvincing. Sepulveda, 401 F.3d at 1232; see AR at 43, 44, 45. As the IJ noted, none of the letters he submitted in support of his case specifically mention any shooting, or other attempted murder, and Diaz has not provided a police report or other official documentation of the incident. The record does not compel a different conclusion.

Additionally, the IJ found that Diaz's explanation for his return to Colombia in November 1999 undermined his claim that he feared persecution. The three-week time lapse between the November 1999 shooting incident and his coming to the United States in December 1999 similarly undermines this claim. There is nothing in the record to suggest that Diaz had any particular information or indication that the situation would be any different in Colombia in November 1999 than it had been in May. Nor is there any explanation of why he waited three weeks after the shooting to return to the United States. Accordingly, we find that the record does not compel a finding that Diaz feared persecution.

Even if the evidence compelled the conclusion that Diaz refused to cooperate with the guerrillas based on his own political opinion, Diaz has also failed to establish that the record compels the conclusion that he has a "well-founded fear" that the guerrillas will persecute him in the future because of that political opinion, rather than because of his refusal to cooperate with them. See Rivera, 487 F.3d at 822; Sanchez, 392 F.3d at 438. As such, substantial evidence supports the IJ's conclusion that Diaz failed to show that he has an objective fear of future persecution on account of his political opinion, and Diaz has not established a pattern or practice of persecution of a group of which he is a member. See 8 C.F.R. § 208.13(b)(2)(iii); Al Najjar, 257 F.3d at 1289. Thus, the record does not compel the conclusion that it was more likely than not that Diaz would be persecuted on account of any statutorily listed factor upon being returned to Colombia. See 8 U.S.C. § 1231(b)(3); Delgado, 487 F.3d at 860-61. Accordingly, he does not meet the standard for withholding of removal.

C. CAT Relief

Diaz also argues that the IJ abused his discretion by finding Diaz ineligible for CAT relief. Under the same standards, we again review the decision of the IJ because its reasoning was adopted by the BIA. See Al-Najjar, 257 F.3d at 1284; D-Muhumed, 388 F.3d at 817; Antipova, 392 F.3d at 1261. To be eligible for relief under CAT, an alien has the burden to show that he will, "more likely than

not," be tortured if removed to the country at issue. 8 C.F.R. § 208.16(c)(2).

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." Id. § 208.18(a)(7). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.16(c)(2). In addition, an IJ must consider "all evidence relevant to the possibility of future torture," including "[e]vidence of past torture inflicted on the applicant" and "[e]vidence that the applicant could relocate to a part of the country . . . where he . . . is not likely to be tortured." Id. § 208.16(c)(3).

We conclude that substantial evidence supports the IJ's conclusion that Diaz is not entitled to CAT relief because Diaz failed to show that he will more likely than not be tortured if he is returned to Colombia. 8 C.F.R. § 208.16(c)(2). Diaz stated on his asylum application that he feared being subjected to torture because

20

he had been declared a military target by FARC, and the Colombian authorities could not "guarantee his security and integrity." AR at 133. Although we treat Diaz's testimony as credible, he failed to offer any evidence or testimony that he would be tortured "at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." See 8 C.F.R. § 208.18(a)(1). Therefore, Diaz's claim that the IJ failed to undertake a separate analysis of the evidence supporting his CAT claim is without merit. The record does not compel the conclusion that Diaz is entitled to relief under CAT.

### III. CONCLUSION

Diaz petitions for review of the BIA's order affirming the IJ's decision denying his application for asylum, withholding of removal, and CAT relief. Because we lack jurisdiction to review the IJ's decision as to the timeliness of Diaz's asylum application, we **DISMISS** his petition as to that claim. Further, substantial evidence supports the IJ's denial of withholding of removal because Diaz failed to show past persecution or that it is more likely than not that he would suffer persecution upon his return to Colombia. Similarly, substantial evidence supports the IJ's conclusion that Diaz is not entitled to CAT relief because Diaz failed to show that he will more likely than not be tortured if he is returned to Colombia. Accordingly, we **DENY** the petition as to Diaz's claims for withholding of removal and CAT relief.

21