MARCUS, Circuit Judge,
specially concurring:
I join fully the majority’s opinion and agree that the BIA’s determination must be vacated and remanded for further fact-finding and explanation of the basis for its decision. The BIA and the IJ concluded that Kazemzadeh failed to establish a well-founded fear of persecution on account of his conversion to Christianity from Islam. In support of this determination, the BIA and the IJ cited only two elements: the fact that no one in Iran, including Kazemzadeh’s parents, was yet aware of the petitioner’s conversion; and the Iran Country Report on Human Rights Practices — 2005 (“State Department Report”), although they did not explain which part of the lengthy report they found pertinent. On this scant record, we cannot conduct meaningful appellate review of the BIA’s determination.
At oral argument and in their appellate brief, the government said that Kazemzadeh had not shown “that his commitment to the religion” indicated he would practice in a way that would come to the attention of the authorities. To the extent the BIA’s decision turns in any way on the idea that Kazemzadeh could avoid persecution by abandoning his faith, that is not an acceptable consideration. And, to the extent that its decision turns on the suggestion that Kazemzadeh could practice his Christian faith “underground,” and thereby elude discovery, that too may not be factored into the calculus of risk associated with a well-founded fear analysis. As I see it, the requirement that an asylum petitioner abandon his faith, or practice only in the dead of night, amounts to religious persecution.
I write separately to underscore these points. First, it is legal error to deny asylum on the basis of well-founded fear of religious persecution on the theory that an individual may escape discovery by abandoning his faith or hiding it and practicing his religion underground. Second, as I see it, there is a substantial body of undisputed evidence in this record, and never mentioned by the BIA, that supports the objective component of Kazemzadeh’s well-founded fear that he could be sanctioned in Iran for apostasy. And, third, this is not a case that presents any palpable risk of admitting any fraudulent claims on the basis of a phony religious conversion because, as the majority opinion points out, both the IJ and BIA necessarily accepted Kazemzadeh’s conversion as genuine.
I.
The BIA concluded that Kazemzadeh “failed to present sufficient testimonial or documentary evidence to establish that a reasonable person in his circumstances would fear persecution upon return to Iran.” It is surely true that to satisfy this requirement Kazemzadeh need only demonstrate that there was a “reasonable possibility” of future harm in Iran on the basis of a protected ground. 8 C.F.R. § 208.13(b)(2)(iii); I.N.S. v. Cardozar-Fonseca, 480 U.S. 421, 440, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (explaining that when seeking asylum on account of a fear of future persecution “it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility.”); Mejia v. U.S. Att’y Gen., 498 F.3d 1253, 1256 (11th Cir.2007) (the petitioner “need *1357 only show that there is a reasonable possibility of suffering such persecution if he or she were to return to that country.”) (quotation marks, alteration, and citation omitted).
In holding that Kazemzadeh failed to meet this “reasonable possibility” standard, the BIA’s rationale is spare and nonspecific. However, in light of its conclusion and the government’s argument, it appears that the reasoning goes something like this: while Kazemzadeh is a genuine convert to Christianity, and, while apostasy is a capital offense in Iran, no one in Iran yet knows of his conversion, and, since Kazemzadeh may either cease to practice or, like other Muslim converts to Christianity, practice “secretly” and “underground,” the likelihood of discovery is small, and, therefore, the record allows the inference that his fear of persecution is not well-founded. This reasoning turns on the assumption that Kazemzadeh may abandon his faith or practice it underground and thereby elude discovery. The pivotal legal problem with the argument is that it erroneously assumes Kazemzadeh is not entitled to claim asylum on the basis of religious persecution because he can practice his faith in hiding in order to avoid discovery and the possible penalty of death. In my view, any requirement that Kazemzadeh abandon his faith or practice in secret in order to conceal his conversion amounts to religious persecution under our asylum laws.
There is no universally accepted definition of persecution. The INA is silent on the term’s definition. See 8 U.S.C. § 1101(a)(42); see also Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir.2000). Likewise, the BIA has never defined persecution directly. See Sahi v. Gonzales, 416 F.3d 587, 588-89 (7th Cir.2005) (“[W]e haven’t a clue as to what [the BIA] thinks religious persecution is.”). This Court has repeatedly held that “persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution.” Sanchez Jimenez v. U.S. Att’y Gen., 492 F.3d 1223, 1232 (11th Cir.2007) (quotation marks omitted). As I see it, forcing Kazemzadeh to either renounce his faith or practice it clandestinely, on pain of death, is an “extreme” concept that far exceeds “mere harassment.” Indeed, it is a notion that is at war with our case law and with our nation’s founding values.
In Antipova v. United States Attorney General, we held that the BIA erred in denying withholding of removal to a Russian national of Jewish faith on the ground that she had “ ‘telegraphed [her] ethnicity or religious affiliation,’” 392 F.3d 1259, 1263 (11th Cir.2004) (quoting the U.S. Transcript of Pre-decision Discussion with Counsel). In that case, we rejected the idea that asylum applicants could be required to hide their religion in order to avoid persecution:
the INA and the related regulations governing withholding of removal do not require applicants who have faced persecution “on account of race, religion, nationality, membership in a particular social group, or political opinion” to avoid signaling to others that they are indeed members of a particular race, or adherents of a certain religion, etc. Nothing in those regulations supports such a requirement.
Id. at 1264-65.
At least two of our sister circuits have squarely held that to require an individual to hide the exercise of his religion in order *1358 to avoid persecution violates our immigration laws. The Seventh Circuit has repeatedly granted asylum on the ground of religious persecution to petitioners who could have avoided punishment for religious “subversiveness” only if they practiced their faith secretly. Iao v. Gonzales, 400 F.3d 530, 532 (7th Cir.2005) (“She might be able to conceal her adherence to Falun Gong from the authorities, but the fact that a person might avoid persecution through concealment of the activity that places her at risk of being persecuted is [not] inconsistent with her having a well-founded fear of persecution. On the contrary, it is the existence of such a fear that motivates the concealment.”) (citations omitted); Muhur v. Ashcroft, 355 F.3d 958, 960-61 (7th Cir.2004) (“[T]he fatal flaw in the immigration judge’s opinion lies ... in the assumption — a clear error of law — that one is not entitled to claim asylum on the basis of religious persecution if (a big if, by the way) one can escape the notice of the persecutors by concealing one’s religion. Christians living in the Roman Empire before Constantine made Christianity the empire’s official religion faced little risk of being thrown to the lions if they practiced their religion in secret; it doesn’t follow that Rome did not persecute the Christians, or that a Christian who failed to conceal his faith would be acting ‘unreasonably.’ ... One aim of persecuting a religion is to drive its adherents underground in the hope that their beliefs will not infect the remaining population.”) (citations omitted).
Similarly, the Ninth Circuit has held that requiring a petitioner “to practice his beliefs in secret is contrary to our basic principles of religious freedom and the protection of religious refugees.” Zhang v. Ashcroft, 388 F.3d 713, 719-20 (9th Cir.2004). The Eighth Circuit also has suggested that preventing a member of an unpopular religion from practicing could constitute religious persecution. In Woldemichael v. Ashcroft, the court explained that “[a]bsent physical harm, subjecting members of an unpopular faith to hostility, harassment, discrimination, and even economic deprivation is not persecution unless those persons are prevented from practicing their religion or deprived of their freedom.” 448 F.3d 1000, 1003 (8th Cir.2006) (emphasis added).
The suggestion that a petitioner seeking asylum on account of religious persecution may be required to practice his faith in the dead of night collides with our nation’s ideals about the exercise of religious freedom. The right to practice only surreptitiously and under fear of death is not free exercise. Although I do not presume to superimpose our Free Exercise Clause jurisprudence onto asylum law, the suggestion implicit in the BIA’s findings and in the government’s argument contradicts both the values of our founders and the values that the drafters of the Refugee Act of 1980, Pub.L. No. 96-212, 94 Stat. 102 (1980) (the “Refugee Act”), embodied when codifying the asylum sections of the INA.
The right to practice one’s faith and to do so in public stands at the heart of free exercise. From the earliest constructions of the free exercise of religion, the freedom of open and “visible” worship was the de minimus requirement. See Michael W. McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L.Rev. 1409, 1459-60 (1990) (quoting W. Penn, The Great Case of Liberty of Conscience, in 1 A Collection of the Works of William Penn 447 (London 1726 and photo, reprint 1974)). The framers of the Constitution worried greatly about religious persecution: “From the *1359 outset, the prevention of persecution, penalties, or incapacities on account of religion has served as a common ground among all the various interpretations of religious liberty.” Id. at 1474. James Madison defined free exercise as free practice, observing that “[t]he Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right.” James Madison, Memorial and Remonstrance Against Religious Assessments (1785), in Founding the Republic: A Documentary History 90 (John J. Patrick ed., 1995). Madison kept in clear view the dangers of religious persecution:
Torrents of blood have been spilt in the old world, by vain attempts of the secular arm, to extinguish Religious discord, by proscribing all difference in Religious opinions. Time has at length revealed the true remedy. Every relaxation of narrow and rigorous policy, wherever it has been tried, has been found to assuage the disease. Id. at 92.
The Supreme Court, relying in no small measure on the writings of James Madison and Thomas Jefferson, defined free exercise in Everson v. Board of Education to mean, among other things, that a state can neither “force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion.” 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Similarly, the Court, some forty-six years ago, made it clear that
[n]othing but the most telling of personal experiences in religious persecution suffered by our forebears could have planted our belief in liberty of religious opinion any more deeply in our heritage .... This freedom to worship was indispensable in a country whose people came from the four quarters of the earth and brought with them a diversity of religious opinion.
Sch. Dist. of Abington Twp., Pa. v. Schempp, 374 U.S. 203, 214, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); see also Johnson v. Robison, 415 U.S. 361, 375 n. 14, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974).
The Supreme Court has consistently regarded the freedom to practice religion openly and notoriously to be at the heart of our government’s structure and the founding ideas of free exercise: “The Fathers of the Constitution ... fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man’s relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views.” United States v. Ballard, 322 U.S. 78, 87, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). The Court has placed this freedom of religious worship beyond the interpretation of governments or courts: “it is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment.” Fowler v. State of R.I., 345 U.S. 67, 70, 73 S.Ct. 526, 97 L.Ed. 828 (1953) (supporting the right of Jehovah’s Witnesses to worship in a public park).
Freedom of religious practice also resonates within the INA’s legislative history. The asylum provisions of the INA governing this case were incorporated into law in the Refugee Act, Pub.L. No. 96-212, 94 Stat. 102 (1980). While drafting the Refugee Act, Congress repeatedly referenced the founding legacy of our nation as a powerful motivation for the creation of the *1360 statutory scheme protecting asylum seekers from religious persecution. Thus, for example, Senator Strom Thurmond, in the floor debate, invoked our nation’s history as a refuge for those escaping religious persecution, observing that this bill would “tell those who come after us that we were true to our heritage as a people and a Nation 125 Cong. Rec. S23231, S23238 (1979); see also 126 Cong. Rec. H4498, H4503 (1980) (statement of Rep. Danielson) (“[T]raditionally, America is the land of people in need, people who are troubled and seek refuge.”).
In fact, the Refugee Act was created in no small measure as a response to some of the world’s largest contemporary refugee crises; the hearings focused on the need to protect Soviet Jewish refugees, Middle Eastern Christian refugees, and Iranian minorities from religious persecution. U.S. Refugee Programs, Hearing Before the Comm. on the Judiciary, United States Senate, 96th Cong. 4, 7-8, 13 (1980).[1] In my view, the statutory scheme created by Congress to protect asylum-seekers was designed to afford more robust protection to the free exercise of religion than the BIA appears willing to afford Kazemzadeh.
Neither the founders nor the drafters of the Refugee Act could have accepted the narrow view that secret practice can cure persecution. The apparent view that a petitioner is not entitled to asylum on account of religious persecution so long as he can mitigate the atrocities of his situation by hiding his faith and practicing only in darkness cannot be squared with the asylum statute. Forced clandestine practice amounts to religious persecution all by itself; it should not be the guarantee of safety to which we relegate genuine converts who have attracted the attention of a totalitarian state.
II.
Once the possibility of practicing underground is eliminated from the calculus of risk, it is likely that the BIA may also have erred as a matter of fact. As I read the record, while it may not compel the conclusion, it does offer substantial evidence that Kazemzadeh has a well-founded fear of persecution on account of his religion. See Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir.2004). Again, to prove a well-founded fear, the petitioner must meet here only the standard of “reasonable possibility.” Cardoza-Fonseca, 480 U.S. at 440, 107 S.Ct. 1207. Although the BIA focused on the present time in finding that “there is no indication that anyone in Iran is aware of the respondent’s recent conversion to Christianity,” the relevant inquiry is not whether anyone now knows, but whether the record supports the inference that it is “reasonably possible” that the authorities will know. Powerful record evidence suggests future discovery; as the majority opinion has explained, the BIA must address these undisputed facts on *1361 remand, or at least indicate that it has reviewed them.
As I see it, the following circumstances support a finding that Kazemzadeh’s apostasy will be discovered by the Iranian government in the future and that, as a result, he will face persecution in Iran on account of his religion: (1) it is undisputed that Kazemzadeh is a genuine apostate and apostasy is a crime punishable by death in Iran; (2) Kazemzadeh regularly practices Christianity, attending two-hour long Sunday worship services three out of four Sundays a month and at least ten two-hour long religious education classes, and we, therefore, have every reason to expect that he will continue to practice his faith; (3) scores of people in the United States know of his “apostasy” and may try to contact him, his family, or the authorities in Iran, including some 1,000 to 1,200 parishioners with whom he attends Sunday worship services, his pastors, the West Kendall Baptist Church, the multiple Baptist associations, his Iranian friend who introduced him to Christianity, and his uncle; (4) plainly, he is a person of heightened interest to the Iranian government because of his considerable role as a known student protestor, already sanctioned by the Iranian state, and as the son of a known dissident; and (5) his apostasy is undeniably a matter of public record that can easily be found by Iranian authorities since the BIA makes no effort to conceal its proceedings from international eyes, and all of the opinions of this Court are recorded publicly on the Internet for all the world to see.
All of this goes to the calculus of risk; unfortunately, the BIA’s opinion reveals precious little about how they measured these facts or any others in their calculus. Thus we cannot begin to perform any meaningful appellate review from this barren opinion. See Atchison, T. & S.F. Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 807, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (“We must know what a[n agency’s] decision means before the duty becomes ours to say whether it is right or wrong.”) (citations and quotation marks omitted); Abdulai v. Ashcroft, 239 F.3d 542, 555 (3d Cir.2001) (“[T]he availability of judicial review (which is specifically provided in the INA) necessarily contemplates something for us to review.”). As the majority writes, the BIA must tell us something about its reasoning and the basis for the judgment.
III.
Finally, it is worth saying what this case is not about. This case does not present a risk of permitting fraudulent asylum claims on the basis of religious persecution. Because refugees must show a threat of particularized harm to establish eligibility for asylum, Mohammed v. U.S. Atty. Gen., 547 F.3d 1340, 1345 (11th Cir.2008), a legal determination that forcing an individual to practice his religion in complete secrecy constitutes religious persecution does not open the floodgates of asylum. On this record, we have to accept that Kazemzadeh is a genuine convert to Christianity who is seeking refuge from a nation that can impose the death penalty for apostasy. Moreover, the Iranian government has already arrested, detained, beaten, monitored, and otherwise punished him for his political activities, which, notably, included protesting the lack of religious freedom in Iran. Simply put, Kazemzadeh is a wanted man in Iran. He has a strong foundation to fear being “singled out for persecution” on the basis of his genuine religious conversion. Al Najjar, 257 F.3d at 1287. And while the *1362 sovereign has a powerful interest in preventing aliens from filing fraudulent petitions for asylum, malingering is not at issue in this case. There is no threat of floodgates opening here.
At the end of the day, the BIA may have made a grievous error of law by denying Kazemzadeh’s petition for asylum by implicitly accepting that he can avoid the discovery of his apostasy and persecution by renouncing Christianity or practicing in secret. But it cannot be the law that the BIA can force an individual to avoid one form of persecution — the possible imposition of the death penalty — only by enduring another form of religious persecution— abandoning his faith or practicing “underground.” The BIA may not consider clandestine practice in its risk calculus.

. See also The Refugee Act of 1979, S. 643: Hearing Before the S. Comm, on the Judiciary, 96th Cong. 8, 10 (1979) (statement of Hon. Dick Clark, U.S. Coordinator for Refugee Affairs); Refugee Act of 1979: Hearings before the Subcomm. on Immigration, Refugees, and International Law of the H. Comm, on the Judiciary, 96th Cong. 74, 77 (1979) (statement of Bernard Manekin, Soviet Jewish Resettlemenl Program Comm.); Admission of Refugees into the United Stales: Hearings before the Subcomm. on Immigration, Refugees, and International Law of the Comm, on the Judiciary, H.R., 95th Cong. 15, 52 (1977) (testimony of James Carlin, Deputy Coordinator for Human Rights and Humanitarian Affairs, Department of State).