[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 7, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-16343

_____

BIA Docket Nos. A78-602-857
A78-602-858

IRINA EFIMOVNA ANTIPOVA,
GEORGIY ANDREYEVICH VOLKOV,

Petitioners,

versus

UNITED STATES ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

(December 7, 2004)

Before BARKETT and HULL, Circuit Judges, and EDENFIELD[*], District Judge.

BARKETT, Circuit Judge:

_____

[*] Honorable B. Avant Edenfield, United States District Judge for the Southern District of Georgia, sitting by designation.

Irina Efimovna Antipova, a Russian national, petitions for review of the Board of Immigration Appeals's ("BIA's") final order, affirming without opinion the Immigration Judge's ("IJ's") denial of her request for withholding of removal for her husband and herself, pursuant to the Immigration and Nationality Act ("INA"). Antipova argues that the IJ failed to follow the regulatory framework by not making a predicate finding as to whether she suffered past persecution. Antipova asserts that, based on the evidence of past persecution, she was entitled to a presumption of future persecution. Antipova contends that the IJ denied her the benefit of the presumption, and improperly required her to assume the burden of showing the likelihood of future persecution and the unreasonableness of internal relocation. Antipova also argues that the IJ erred in the factors that he considered in deciding whether internal relocation was reasonable and whether Antipova demonstrated the likelihood of a future threat to her life or freedom.

STANDARD OF REVIEW

The IJ's findings of fact are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar v. U.S. Attorney Gen., 257 F.3d 1262, 1283-84 (11th Cir. 2001) (internal quotation omitted). Under this highly deferential standard of review, the IJ's decision must

2

be deferred to as supported by substantial evidence, unless the evidence compels a reasonable fact finder to find otherwise. INS v. Elias-Zacarias, 502 U.S. 478, 481 n.1, 112 S.Ct. 812, 815 n.1, 117 L.Ed.2d 38 (1992). We "cannot engage in fact-finding on appeal, nor . . . weigh evidence that was not previously considered below." Al Najjar, 257 F.3d at 1278. We review the agency's statutory interpretation of its laws and regulations de novo. Barreto-Claro v. U.S. Attorney Gen., 275 F.3d 1334, 1338 (11th Cir. 2001). However, we defer to the agency's interpretation if it is reasonable and does not contradict the clear intent of Congress. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984).

## BACKGROUND

Antipova entered the United States in January 1997, with permission to remain until July 1997. She filed an application for asylum in December 2000. The INS served Antipova with a notice to appear in January 2001 and charged her with removability for having remained in the U.S. beyond the time permitted. At her hearing, the IJ found that Antipova's asylum application was untimely and that she had failed to show the "extraordinary circumstances" that would excuse an untimely application. As a result, the IJ considered Antipova as being eligible for relief only under the withholding of removal provisions of INA § 241. Antipova

3

does not contest this determination.

Antipova appeals only from the denial of withholding of removal. She argues that the regulatory framework of the INA requires an IJ to make a determination of past persecution (or lack thereof) in evaluating an application for withholding of removal, and that the IJ failed to do so in this case. As a result, she further argues, the IJ failed to determine whether Antipova could benefit from a rebuttable presumption that she would face future persecution upon being returned to Russia.

At her immigration hearing, Antipova testified that she was born to a Jewish mother and a non-Jewish father in a small village in rural Russia. Her family celebrated Jewish holidays at home and occasionally attended a distant synagogue. Although a good student, she received a negative scholastic recommendation because of her refusal to participate in her school's political activities and because she attended the synagogue.

After her family moved to Moscow, Antipova enrolled in a university and regularly attended meetings of a Jewish organization. In April 1989, the police arrested and detained the organization's members (including Antipova) and closed their meeting space. Antipova began to receive threatening calls stating that Russia was not for Jews and that she had to relocate to Israel. The organization's

4

meeting place was later burned down.

Antipova testified that in 1993, she was demoted from her technologist position to a cleaning position because her employers were using privatization as a disguise for dismissing Jews and people of other nationalities. Antipova and her husband (whom she met during a trip to Israel in 1994) were married in December 1994. That same month, while she was lighting a menorah candle to celebrate Hanukkah, someone threw a stone through the window, injuring Antipova's hand. The stoned was wrapped in a note that read "death to the kikes." Because her landlords were fearful of another attack on their property, Antipova and her husband were asked to leave the apartment. They stayed intermittently with relatives. In August 1995, while Antipova was visiting Japan as part of a dance troupe, her husband reported to her that they continued to receive threatening phone calls as well as a note that read "off with the kikes."

The threats soon escalated into physical attacks. In February 1996, while returning from synagogue, Antipova was attacked in front of her mother's home by persons wearing black clothing and swastika insignias associated with the Russian National Unity Movement ("RNU"). The RNU members beat her and told her that Russia was not for Jews. Antipova was taken by ambulance to a hospital.

After her husband's employer awarded him with a trip to the U.S. in July

5

1996, Antipova remained in Russia and was again attacked after visiting a synagogue with her mother in September 1996. A group of people wearing black clothing berated Antipova for being Jewish and beat her to unconsciousness. She was hospitalized for six days following the attack. Antipova reported the incident to the police but never received a response.

Antipova testified that, after joining her husband in the U.S. in January 1997, her family in Russia was thrown out of their apartment following another episode of anti-Jewish vandalism. They returned to their native village. In February 2001, Antipova's mother was beaten by a group of neo-Nazi youth. Antipova testified that she could not return to her native village because everyone there would know she was Jewish, and could not return to Moscow because she did not have the means to rent an apartment there. She also stated that her brother was unable to make friends or find work as a result of the discriminatory situation facing Russian Jews.

According to Antipova, conditions in Russia have worsened under President Putin's regime, with anti-Semitic groups growing and operating openly. In support of her application, Antipova submitted various State Department reports and other documents detailing the long history of discrimination against Jews in Russia and the resurgence of anti-Semitic publications and vandalism in recent years. These

6

documents demonstrated that despite efforts by the Putin administration to combat it, anti-Semitism remains a serious problem in Russia. Nor is the problem one of private discrimination only. The evidence set forth by Antipova showed that some regional and municipal authorities have abused residential registration requirements to make it more difficult for Jews to locate within the country.

On June 12, 2002, just before rendering an oral decision on Antipova's case, the IJ had a discussion with counsel in which he explained that Antipova's case fell short of showing that it was "more likely than not" that she would face persecution upon being returned to Russia. The IJ stated that while Russian Jews were able to receive a "free pass" to the U.S. during the Cold War, "conditions have changed" and there was now "plenty of" anti-Semitism not only in Russia but also in the U.S. Transcript of Pre-decision Discussion with Counsel at 111. After noting that he was not satisfied that internal location within Russia was unavailable to Antipova – because anti-Semitism was not a "countrywide" phenomenon – the IJ stated that the two attacks on Antipova both involved situations in which she had "telegraphed [her] ethnicity or religious affiliation," whether by displaying a menorah candle in the window or by attending synagogue. Id. at 112. He went on to elaborate:

> So, I don't think that this is the situation where one has such a highly
> visible immutable characteristic that one cannot conduct one's self

7

with some degree of – it's a shame people have to do it but with some certain degree of circumspection, perhaps, for lack of a better record, in order to minimize the chances that one is going to encounter this type of hostility.

Id. at 112-13.

In his oral decision, after recounting Antipova's testimony as summarized above, and after explaining that Antipova had failed to show the "extraordinary circumstances" that would excuse an untimely asylum application, the IJ set forth the standard for determining whether an applicant was entitled to withholding of removal. He found that Antipova had failed to establish that, upon being returned to Russia, it was more likely than not that she would face persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Citing Antipova's display of the menorah candle in her window and her attendance of synagogue, the IJ found that "many of the acts of alleged persecution" that Antipova described took place as a result of her having "advertised to passers by or observers that she was, in fact, practicing Judaism and therefore presumptively was of Jewish ethnicity or nationality." IJ Order at 13. He further found that Antipova's argument that her name itself would make it clear that she was Jewish was unfounded given that her name was not an exclusively Jewish one. Id. at 13-14. The IJ acknowledged that anti-semitism was on the rise in Russia and that the Russian government did not seem to be taking active steps to

8

contain it, but found that

> the Court cannot conclude based upon the evidence of this case that it is more likely than not that either [Antipova or her husband] would be persecuted or harmed in a manner that could be deemed persecutory simply on account of either their religious affiliation or an ethnic or nationality affiliation that could be attributed to them.

Id. at 14-15.

## DISCUSSION

Because Antipova's removal proceedings commenced after April 1, 1997, the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ("IIRIRA"), this case is governed by the permanent provisions of the INA, as amended by IIRIRA. Gonzalez-Oropeza v. U.S. Attorney Gen., 321 F.3d 1331, 1332 (11th Cir. 2003); Balogun v. U.S. Attorney Gen., 304 F.3d 1303, 1309 (11th Cir. 2002). When the BIA summarily affirmed the IJ's decision without an opinion, the IJ's decision became the final removal order subject to review. See Mendoza v. U.S. Attorney Gen., 327 F.3d 1283, 1284 n.1 (11th Cir. 2003) (citing 8 C.F.R. § 3.1(a)(7) (2002)).

> The INA provides that

> the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political

9

opinion.

8 U.S.C. § 1231(b)(3)(A). Under the regulations that govern this withholding of removal provision, the burden of proof is on the applicant to establish that she would face persecution on account of one of the five covered grounds upon return to the proposed country of removal. 8 C.F.R. § 208.16(b).

However, the regulations also provide that if the applicant is determined to have suffered past persecution in the proposed country of removal, a rebuttable presumption arises that her "life or freedom" would again be threatened upon removal to the proposed country. 8 C.F.R. § 208.16(b)(1)(i). This presumption arises "on the basis of the original claim"; it does not require any showing on the part of the applicant of a likelihood of future persecution. Id. The presumption can be rebutted in one of two ways. The INS must show, by a preponderance of the evidence, either that there has been a fundamental change in circumstances in the proposed country such that the applicant need no longer fear persecution, or that the applicant could avoid a future threat by relocating within the proposed country and that it would be reasonable to expect her to do so. 8 C.F.R. § 208.16(b)(1)(i)(A&B). The regulations are clear that where an applicant has established past persecution, the burden of establishing the requirements of the above two scenarios lies with the INS. 8 C.F.R. § 208.16(b)(1)(ii). Only where

10

the applicant's fear of future persecution is "unrelated" to past persecution, or where she has not actually suffered past persecution, does she bear the burden of establishing that it is "more likely than not" that she would suffer persecution upon removal. 8 C.F.R. § 208.16(b)(1)(iii) and (b)(2).

In this case, the IJ's decision did not make a finding regarding past persecution. Furthermore, the INA and the related regulations governing withholding of removal do not require applicants who have faced persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion" to avoid signaling to others that they are indeed members of a particular race, or adherents of a certain religion, etc. Nothing in those regulations supports such a requirement.

What the regulations do provide is that, if an applicant has established past persecution, the INS can overcome the presumption of future persecution by showing that she could avoid future threats by relocating within the country, assuming that it is reasonable under all the circumstances to do so. 8 C.F.R. § 208.16(b)(1)(i)(B). The IJ did not pretend to tether his remarks about Antipova's "advertising" or "telegraphing" of her Jewishness to this provision of the regulations, nor could he reasonably have done so.

The IJ's obligation, under 8 C.F.R. § 208.16(b), to determine whether an

11

applicant has suffered past persecution and so qualifies for a presumption of future

persecution cannot be discharged by asking whether the applicant could have

somehow avoided the past persecution. In this case, Antipova presented

substantial and (apparently) credible evidence, including testimony and medical

records, that she and her family had suffered several incidents of physical, verbal,

and written abuse on account of their status as Jews. The IJ has the discretion to

determine whether these incidents rose to the level of "persecution" and whether

they occurred on account of Antipova's religion or ethnicity.[1] But the regulations

do not give the IJ the discretion to refrain from making a determination regarding

past persecution altogether.[2] The IJ's failure to make this determination precludes

us from undertaking meaningful judicial review of the merits of his order. See

Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 22 (1st Cir. 2004) ("[t]he absence of

---

[1] We note that the IJ made several statements that tend to support a finding that Antipova was targeted on account of her religion or ethnicity. During the course of the hearing, the IJ stated that he considered Antipova's proximity to sites of religious observance a key to the attacks. Transcript of Pre-decision Discussion with Counsel at 112. The IJ's finding that Antipova was, in fact, Jewish is implied by his reasoning that one would not "know that she is of Jewish ethnicity or nationality" based solely on her surname (emphasis added). IJ Order at 14. The IJ's acceptance that the immutable characteristic of being Jewish was a factor in Antipova's mistreatment is implied by his qualifying statement that the case did not involve "such a highly visible immutable characteristic that one cannot conduct one's self with some degree of . . . circumspection" (emphasis added). Transcript of Pre-decision Discussion with Counsel at 112-13. These statements support, rather than undermine, a finding that Antipova suffered past persecution on account of her religion or ethnicity.

[2] In this connection, we note that withholding of removal, where warranted, is a mandatory and not a discretionary remedy. Al Najjar, 257 F.3d at 1303; 8 C.F.R. § 208.16(c).

reasoned discussion of past persecution undercuts any meaningful review of the [agency's] fear of future persecution finding, because we do not know whether [the applicant] should have had the benefit of the regulatory presumption of fear of persecution based on prior events.").

Where an applicant for withholding of removal sets forth credible evidence that she has suffered past persecution in the proposed country of removal, 8 C.F.R. § 208.16(b)(1)(i) requires the IJ to make a finding regarding past persecution. If the IJ finds that the incidents recounted by the applicant rise to the level of persecution and occurred on account of a protected ground, then the IJ must apply the presumption of future persecution in favor of the applicant and proceed to determine whether that presumption can be rebutted in either of the two ways envisioned by 8 C.F.R. § 208.16(b)(1)(i)(A&B).

This case is vacated and remanded to the BIA for a finding regarding past persecution and the applicability of a presumption of a future threat to Antipova's life or freedom.

**VACATED and REMANDED**.