[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-14933

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 12, 2006
THOMAS K. KAHN
CLERK

BIA No. A95-230-669

JOHN ONYEKACHI NWOKEAFOR,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(June 12, 2006)**

Before DUBINA, KRAVITCH and GIBSON[*], Circuit Judges.

PER CURIAM:

_____

[*] Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

John Onyekachi Nwokeafor, an apparent native and citizen of Nigeria, seeks review of an order by the Board of Immigration Appeals ("BIA") adopting and affirming the immigration judge's ("IJ") denial of his application for asylum. Because Nwokeafor did not establish that he is eligible for asylum, we deny the petition for review.

## I. Background

On October 27, 2001, the former Immigration and Naturalization Service[1] ("INS") issued Nwokeafor, who was present in the United States without having been admitted or paroled, a Notice to Appear, charging him with removability under INA § 212(a)(6)(A)(i); 8 U.S.C. § 1182(a)(6)(A)(i).

Nwokeafor filed an application for, inter alia, asylum relief,[2] alleging that he had been persecuted by Muslim militants because he was Christian and active in the Apostolic church. In support of his asylum application, Nwokeafor submitted numerous articles about the religious riots in his hometown of Jos, Nigeria.

---

[1] On 25 November 2002, President Bush signed into law the Homeland Security Act of 2002 ("HSA"), Pub.L. No. 107-296, 116 Stat. 2135. The HSA created a new Department of Homeland Security ("DHS"), abolished the INS, and transferred its functions to the new department. However, because this case was initiated while the INS was still in existence, this opinion refers to the agency as the INS rather than the DHS.

[2] Nwokeafor also requested withholding of removal and relief under the Convention Against Torture ("CAT"). On appeal, he does not raise these issues and, therefore, has abandoned them. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 (11th Cir. 2005).

Nwokeafor testified at his hearing before the IJ as follows: In 1992 he participated in a protest against Nigeria's joining the Organization of Islamic Conferences, during which he was attacked, burned with oil, had his teeth knocked out, and was arrested and placed in jail for two nights. In 1995, his family's ground nut warehouse was burned down as a result of religious violence. By 1997, Nwokeafor was working for the Apostolic Church in Jos and had moved into the church compound with his family, and in 1998 he opened a Christian bookstore. Muslim militants smashed the windows and damaged the store, but Nwokeafor did not file a police report, as he believed the police were on the side of the Muslim militants. After he cleaned up the damage, the vandals returned and left a letter of warning. In 1999, militants attacked and stabbed Nwokeafor's wife as she returned from Bible study as a message to him. One of his daughters was also attacked by Muslim militants.

In September 2001, a Christian woman was attacked and killed on a road outside a mosque because her head was not covered. The incident sparked riots between Muslims and Christians, during which Nwokeafor was stabbed. Because Nwokeafor had been a leader of the local Christian youth brigade and active with the church, the militants targeted him for attack. A Muslim friend hid him from the Muslim militants for about a week, and then he disguised himself and stayed with friends for a few weeks. Nwokeafor knew the Muslims were searching for

3

him because they had burned his church and shot the pastor. Thereafter, he escaped from Jos by bus. The bus driver and several passengers took him captive, however, holding him in an old building. He and a Jehovah's Witness who was also taken captive were able to escape and were eventually picked up by a Christian truck driver who drove them to the port and helped them arrange room aboard a cargo ship. The ship arrived in Savannah, Georgia, and he eventually made his way to Florida. Nwokeafor had received no word of his family since the riots began.

In the course of the INS investigation, Nwokeafor gave the authorities his Nigerian passport and stated that he had never had a birth certificate.[3] With the assistance of a man named Emma, he had applied for the passport by mail as part of his asylum application. Nwokeafor had owned a passport once before, but it was destroyed when his house was burned. When he obtained the first passport, he had done so in person and had not been required to submit any supporting documentation. The IJ expressed concern regarding the passport's authenticity and questioned Nwokeafor as to how it had been issued, noting that it should be

---

[3] Also in preparation for his asylum application, Nwokeafor had obtained a copy of a registration of birth with the help of a man he had contacted through the local church. Nwokeafor no longer had the man's contact information. Nwokeafor doubted the certificate's validity because births were not generally recorded in Jos. He also submitted an ID card from the Apostolic Church, which was signed by an employee of the church, although Nwokeafor could not recall the employee's name.

traceable through its control number. Although acknowledging the riots and other difficulties in Jos, the IJ stated that she would deny Nwokeafor his requested relief if the passport could not be verified. The IJ suspended the hearing, allowing additional time for verification.

At a follow-up hearing, Nwokeafor submitted a letter from the Nigerian Embassy indicating that, according to the photocopy the embassy had received, the passport looked genuine, although it could not be authenticated. Nwokeafor then presented two witnesses: Ezekiel Orji and Robert Burton. Orji testified that he was a Nigerian native and a citizen of Florida; he had submitted an affidavit stating that he had been present when Nwokeafor was born in Jos and that he knew Nwokeafor's family. Orji stated that he had obtained his own Nigerian passport by submitting an affidavit of birth, a sworn application by his parish priest, and a copy of an application form with pictures. Orji also admitted that he had traveled to Nigeria without incident. Burton, an Episcopal priest at Nwokeafor's church in Florida, testified that both Orji and Nwokeafor were members of his congregation and that both were active in the church.

Nwokeafor argued that he had established his identity and nationality with his passport and the corroborating evidence from Orji. However, the IJ ultimately denied relief, concluding that Nwokeafor had not established his nationality and identity given the scepticism over the birth certificate and Nwokeafor's failure to

5

verify the authenticity of his passport. The IJ also found that there was no evidence to corroborate Nwokeafor's claims regarding his religious activities in Nigeria. Addressing the merits of Nwokeafor's asylum application, the IJ concluded that there were credibility concerns[4] and that, although the country conditions were well-documented, the attacks on Nwokeafor and his family were not. The IJ further noted that Nwokeafor had not attempted to relocate to a Christian area within Nigeria.

Thereafter, Nwokeafor obtained a letter from the Nigerian Immigration Service indicating that it had issued a passport to Nwokeafor and that the passport was genuine. He sought review from the BIA and moved for a remand, arguing that he had new evidence to verify the authenticity of his passport and establish his identity and nationality. He also argued that he had made a prima facie case establishing his eligibility for asylum. The BIA adopted the IJ's determination, finding the Nwokeafor had not presented adequate evidence suggesting that he was a victim of past persecution or that he has a well-founded fear of future persecution. The BIA also concurred in the IJ's finding that Nwokeafor had not established his identity, his claimed association with the Apostolic church or his

---

[4] Specifically, the IJ stated, "I'm concerned . . . that he's not in contact with his wife, he's not in contact with the children. . . . [I]f we're to believe the entire story that he's a religious man, he actually lived in a church, I don't believe he's just going to walk away from his family like this."

claims regarding harm that he and his family allegedly suffered in Nigeria.

Finally, the BIA concluded that the new evidence submitted by Nwokeafor was

insufficient to cure the evidentiary deficiencies identified by the IJ.

## II. Discussion

When the BIA issues a decision, we review only that decision, "except to the

extent that it expressly adopts the IJ's opinion." Al Najjar v. Ashcroft, 257 F.3d

1262, 1284 (11th Cir. 2001). Here, we review the IJ's opinion because the BIA

has adopted it in full. See D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th

Cir. 2004). Credibility determinations are reviewed under the substantial evidence

test, and the IJ must offer specific, cogent reasons for an adverse credibility

finding. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286-1287 (11th Cir. 2005).

We "must affirm the [IJ's] decision if it is 'supported by reasonable, substantial,

and probative evidence on the record considered as a whole.'"[5] Antipova v. U.S.

Att'y Gen., 392 F.3d 1259, 1261 (11th Cir. 2004).

Although uncorroborated but credible testimony may be sufficient to sustain

the burden of proof for demonstrating eligibility for asylum, 8 C.F.R. §§ 208.13(a),

---

[5] On May 11, 2005, President Bush signed into law the Real ID Act of 2005 ("RIA"), Pub.L. No. 109-13, Div. B, 119 Stat 231. RIA 101(a)(3) amends INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), regarding the assessment of credibility. This amendment took effect on the date of enactment and applies to applications for asylum and withholding of removal made on or after that date. See RIA 101(h)(2). Because Nwokeafor's application for asylum was filed before May 11, 2005, the credibility standard of the RIA does not apply to his petition.

208.16(b), the weaker an applicant's testimony, the greater the need for corroborative evidence. Matter of Y-B-, 21 I&N Dec. 1136, 1139, 1998 WL 99554 (BIA 1998). The IJ's credibility determination is conclusive unless a reasonable factfinder would be compelled to conclude to the contrary. Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002). That evidence in the "record may support a contrary conclusion is not enough to justify a reversal." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004), cert. denied, 125 S.Ct. 2245 (2005). "If the applicant produces no other evidence other than his testimony, an adverse credibility determination is alone sufficient to support the denial of an asylum application." Forgue, 401 F.3d at 1287.

Nwokeafor argues that neither the IJ nor the BIA made an express adverse credibility determination and that, accordingly, the IJ and BIA committed reversible error in demanding documentary evidence corroborating Nwokeafor's otherwise credible testimony. In the alternative, Nwokeafor argues that we should remand this case to allow the IJ to make an explicit credibility determination.

IJ's Credibility Determination

First, Nwokeafor's assertion that the IJ failed to make an adverse credibility determination is incorrect. He is correct in noting that "IJ's must make clean determinations of credibility," however. Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) (internal quotation marks omitted; citation omitted). Here,

8

although the IJ's statement could have been more clear, she made an adequate adverse credibility determination. See Nreka v. U.S. Att'y Gen., 408 F.3d 1361, 1369 n.9 (11th Cir. 2005) (accepting the IJ's statements of concern regarding credibility as adequate, although noting that the IJ could have been more clear).

During Nwokeafor's hearing, the IJ expressed concern "that [Nwokeafor is] not in contact with his wife, he's not in contact with the children. . . . [I]f we're to believe the entire story that he's a religious man, he actually lived in a church, I don't believe he's just going to walk away from his family like this." The IJ expected that Nwokeafor should have been able to obtain business records, school records, a marriage certificate or family pictures supporting his story. She stated that someone should remember Nwokeafor if he had worked at the church for all those years. Finally, in her oral decision, the IJ noted that none of the claimed attacks on Nwokeafor and his family had been documented. The IJ explicitly stated that "[i]n this case the Court does have issues of credibility" and concluded that Nwokeafor "failed to establish his activities in Nigeria or corroborate his claim." The IJ thus made an adverse credibility determination. Likewise, the BIA stated in its order that Nwokeafor failed to "provide specific, detailed, plausible, and coherent information about the basis of his fear of persecution."

As the IJ made an adverse credibility determination and Nwokeafor did not produce any evidence other than his testimony regarding his activities in Nigeria or

the events underlying his claims of persecution, Nwokeafor has not established that the IJ's adverse credibility determination was unsupported by substantial evidence. Accordingly, we need not consider whether the IJ erred in failing to credit the Nigerian government's authentication of Nwokeafor's passport or in determining that Nwokeafor could have safely relocated to a Christian region of Nigeria, and we deny his petition.

PETITION DENIED.