[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Dec. 14, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-17187

_____

Agency Nos. A099-920-296
A099-920-297

ALFREDO ENRIQUE KANN VEGAS,
NELCY JOSEFINA SANCHEZ,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(December 14, 2009)

Before CARNES and HULL, Circuit Judges, and GOLDBERG,* Judge.

PER CURIAM:

_____

*Honorable Richard W. Goldberg, United States Court of International Trade, sitting by
designation.

Petitioners Alfredo Enrique Kann Vegas ("Kann Vegas") and his wife Nelcy Josefina Sanchez petition for review of the Board of Immigration Appeals' ("BIA") decision affirming the Immigration Judge's ("IJ") order denying their applications for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT").[1]  After review and oral argument, we grant the petition.

## I. BACKGROUND

Kann Vegas, a native and citizen of Venezuela, last entered the United States on or about September 17, 2005 on a non-immigrant visa.  On July 25, 2006, Kann Vegas filed an application for asylum, withholding of removal, and relief under CAT, claiming persecution in Venezuela for his political opinion and membership in a particular social group.  The government issued a Notice to Appear, charging Kann Vegas with being removable pursuant to Section 237(a)(1)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(1)(B), as a non-immigrant who remained in the United States beyond the time permitted by his visa.

After an asylum hearing at which Kann Vegas testified, the IJ issued a written decision finding Kann Vegas not credible and denying his applications for

---

[1]The asylum application of Nelcy Josefina Sanchez was derivative of Kann Vegas's application.  Accordingly, the discussion of Kann Vegas's asylum claim on appeal applies equally to Nelcy Josefina Sanchez.

asylum, withholding of removal, and relief under CAT. The IJ explicitly found that Kann Vegas was not credible, listing five reasons to support this finding: (1) Kann Vegas was unable to recall how many demonstrations he attended in an average week after he returned to Venezuela in 2002; (2) Kann Vegas was unable to recall the number of threatening phone calls he received; (3) Kann Vegas's testimony was "general, meager, vague, and lacking in any meaningful detail"; (4) the corroborative evidence Kann Vegas submitted "did little to shed light on [his] political activities"; and (5) Kann Vegas returned to Venezuela from the United States on three separate occasions, even after he was allegedly shot at in Venezuela.[2]

Kann Vegas filed a timely appeal with the BIA. The BIA affirmed the IJ's decision without opinion. Kann Vegas petitioned this Court for review.

## II. DISCUSSION

### A.    Standard of Review

On appeal, Kann Vegas argues that the IJ erred in finding that he was not credible. Because the BIA's decision summarily affirmed the IJ's decision, we review the IJ's opinion. Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1284 n.1

---

[2]In his decision, the IJ cited one additional reason in support of his adverse credibility determination: that Kann Vegas failed to establish he had any scars on his body or that he suffered any permanent physical injury as a result of an incident in April 2005, in which Kann Vegas was kidnaped and electrocuted. The government does not rely on this finding on appeal. Therefore, we do not address it in our analysis of the IJ's adverse credibility determination.

3

(11th Cir. 2003). We review the IJ's factual determinations, including credibility determinations, under the substantial evidence test. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005) (citation omitted). Under this test, we will affirm if the decision "is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (citation and quotation marks omitted). To the extent the IJ's decision was based on a legal determination, review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001).

## B.    Credibility Determinations

An alien is entitled to asylum if he can establish, with specific and credible evidence: (1) past persecution on account of a statutorily listed factor; or (2) a "well-founded fear" that a statutorily listed factor will cause future persecution. 8 C.F.R. §§ 208.13(a), (b); Al Najjar v. Ashcroft, 257 F.3d 1262, 1287 (11th Cir. 2001). If an alien is unable to meet the "well-founded fear" standard for asylum, "he is generally precluded from qualifying for either asylum or withholding of [removal]." Al Najjar, 257 at 1292-93. Similarly, the burden on the alien seeking CAT relief is higher than the burden imposed on the asylum seeker. Id. at 1303.

In order to make an adverse credibility determination, the IJ must explicitly state that the applicant's testimony was not credible. Yang v. U.S. Att'y Gen., 418

4

F.3d 1198, 1201 (11th Cir. 2005).[3] If the IJ explicitly determines an alien is not credible, the IJ must give specific, cogent reasons for the adverse credibility determination. Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1231 (11th Cir. 2006). "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence." Forgue, 401 F.3d at 1287 (quotation marks omitted).

Asylum applications filed after May 11, 2005 – such as Kann Vegas's, which was filed in July 2006 – are governed by the REAL ID Act regarding credibility determinations.[4] Under the REAL ID Act, in making a credibility determination, the IJ must consider the "totality of the circumstances," and may deny an asylum claim based on inconsistencies and falsehoods contained in the evidence without regard to whether they go to the heart of the claim. 8 U.S.C. § 1158(b)(1)(B)(iii); Chen, 463 F.3d at 1231.

---

[3]Kann Vegas also argues that the IJ erred by failing to make a clean adverse credibility determination. This argument lacks merit because the IJ's statement, "I find that [Kann Vegas] was neither credible nor plausible in his testimony surrounding the circumstances that caused [Kann Vegas] and his spouse to flee Venezuela," constitutes a clean adverse credibility determination. Cf. Yang, 418 F.3d at 1201.

[4]The REAL ID Act of 2005 amended 8 U.S.C. § 1158. See Pub. L. No. 109-13, § 101(a)(3), 119 Stat. 231, 303 (2005). The amendments to § 1158(b) took effect on May 11, 2005, the date of enactment, and apply to applications of asylum and withholding of removal filed after that date. See id. § 101(h)(2), 119 Stat. at 305; Chen, 463 F.3d at 1231 (determining that the provisions of the REAL ID Act pertaining to credibility determinations apply to asylum applications filed after May 11, 2005).

**C.    Kann Vegas's Asylum Claims**

After review and oral argument, we conclude that the IJ's adverse credibility determination was not supported by substantial evidence.  The IJ observed that Kann Vegas's testimony was "general, meager, vague, and lacking in any meaningful detail."  However, the record shows that Kann Vegas gave overwhelmingly detailed testimony about each of the incidents described in his asylum application.  Moreover, the IJ did not find any inconsistencies between Kann Vegas's asylum application and his hearing testimony.  We recount examples of what Kann Vegas's application and his testimony together showed about his political acts and the incidents of persecution he alleges.

Kann Vegas avers that if returned to Venezuela, he fears he would be subject to mistreatment by members of a group called the Circulos Bolivarianos ("Bolivarian Circles") on account of his opposition to the ruling Hugo Chavez regime.  In 2002, Kann Vegas became an active member of Primero Justicia ("First Justice"), a political party that opposed the Chavez regime.  In 2004, Kann Vegas was appointed to serve as First Justice's Manager of Electoral Affairs for the Libertador municipality of Caracas, Venezuela.  As Manager of Electoral Affairs, Kann Vegas visited poor neighborhoods in Caracas and encouraged people to vote against Chavez in the August 15, 2004 presidential referendum.  Kann Vegas also participated in political demonstrations in Caracas expressing opposition to the

6

Chavez regime. During some of these demonstrations, Kann Vegas was attacked by members of the Bolivarian Circles, who beat and pistol-whipped him. He also received phone calls at his home, office, and on his cell phone, threatening to harm him if he continued to oppose Chavez. Although the callers did not identify themselves, Kann Vegas believed they were members of the Bolivarian Circles.

In April 2005, Kann Vegas was abducted from his car by members of the Bolivarian Circles. Kann Vegas was driving away from the First Justice party headquarters to pick up his wife who was staying at her mother's house. At around 7:00 p.m., Kann Vegas had reached the "La Casas, el La Casia, Las Acasias area" of Caracas and saw several motorcycles approach him. Kann Vegas was able to avoid the motorcycles for about thirty seconds, but eventually one of the motorcycles intercepted him, approaching his car from the front-left side. A second motorcycle stopped in front of him, and a third from behind. The men on the motorcycles were carrying rifles. They forced Kann Vegas to stop, opened the door, and one of them hit Kann Vegas with a rifle, knocking him unconscious. When Kann Vegas awoke he was in a room, handcuffed, blindfolded, and hanging without a shirt. His captors beat him, electrocuted him, and doused him with water for twelve hours, during which time he came in and out of consciousness. The men called him names such as "little rich boy" and ordered him to stop his political activities. They also told him that the congressmen who were "revolutionaries"

7

and supported Chavez would stay in power. Kann Vegas woke up the next day in a field near a reservoir in the "La Mariposa" area of Caracas, his shoulder and his left side hurting. Kann Vegas was able to walk to a major road, where he found a local resident who had a cell phone, which Kann Vegas used to call his wife. Forty minutes later, his wife arrived and took him to the emergency room at a hospital called "Policlinica Metropolitano," where he was treated for his bruises and for the electrocution. After twenty-four hours, he was released from the hospital. He did not report the incident to the police because, when he was being held by his captors, he heard "police lingo" in the background, and thus did not feel the police would protect him, noting that the "Bolivarian Circles are known to do that kind of stuff."

To corroborate his account of the April 2005 abduction, Kann Vegas submitted a medical report from the hospital "Policlinica Metropolitana, Caracas," dated April 29, 2005. This medical report stated that Kann Vegas was admitted to the emergency room on April 28, 2005, after being abducted and detained for approximately twelve hours, that he had suffered multiple traumas to his head and abdomen, that he had received multiple lacerations, and that he had been electrocuted. Kann Vegas also submitted attestations on his behalf by two officials of First Justice, averring that he was an active member of the organization and that he had been attacked on several occasions by members of the Bolivarian Circles

8

due to his political activities.

In May 2005, members of the Bolivarian Circles approached First Justice's party headquarters and fired shots at Kann Vegas. Kann Vegas stated that he was able to recognize that the people who shot at him were associated with the Bolivarian Circles because he saw their motorcycles and the way that they dressed. Kann Vegas testified that members of the Bolivarian Circles wear a colored vest with a certain number of pockets, which differs depending on their rank. During the incident, Kann Vegas was shot at while heading towards his car. He saw bullets bouncing off of the ground and his car near him.

In July 2005, members of the Bolivarian Circles shot at Kann Vegas and threatened the life of his unborn child. This occurred as Kann Vegas was leaving a meeting at First Justice's party headquarters between 7:00 and 8:00 p.m. Kann Vegas was exiting the headquarters alone, heading towards his car, which was parked on the street because the parking lot in front of the building was full. Kann Vegas observed that at the time he was exiting the building, about six cars were parked in the lot. As he exited, he saw two to four motorcycles approach. Because the motorcyclists were wearing helmets, goggles and bandanas, Kann Vegas could not see their faces, but he identified them as members of the Bolivarian Circles by the way they were dressed, by the motorcycles they were riding – the "Yamaha DT type model," which he described as a "semi-off road, semi-street bike" – and by

9

the colors of the motorcycles. The men fired shots at him, and he heard the men threaten his unborn child: "if you want to see your born, your child be born you better stop now." Even though he managed to escape unharmed, this incident caused a great amount of stress to Kann Vegas and his wife, who nearly had a miscarriage soon thereafter.

After Kann Vegas's abduction in April 2005, he made three trips to the United States – entering the United States on May 6, June 23, and July 27, 2005. After the May 6 and June 23 trips, Kann Vegas returned to Venezuela without applying for asylum. After the July 27, 2005 trip, he stayed in the United States. His wife then came from Venezuela to the United States on September 17, 2005.[5] In July 2006, Kann Vegas and his wife applied for asylum after staying in the United States on nonimmigrant B2 visitor visas.

In addition to the IJ's mischaracterization of Kann Vegas's testimony as vague, other shortcomings found by the IJ in Kann Vegas's testimony are not supported by the record. First, the IJ cited Kann Vegas's inability to recall how many demonstrations he attended in an average week after he returned to Venezuela in 2002. Yet, Kann Vegas explained that there were so many demonstrations that he was unable to give an exact number, and Kann Vegas

_____

[5]Kann Vegas made frequent trips to the United States throughout his life. He studied in the United States in 1991 and returned to finish his degree from 1996 to 1998. He also made several trips from 2001 until he last entered in 2005.

10

estimated that he attended five to ten demonstrations in 2002, thirty demonstrations in 2003, and thirty to forty demonstrations in 2004. Second, the IJ faulted Kann Vegas for not being able to recall the exact number of threatening phone calls he received. But Kann Vegas testified that he received threatening phone calls on a weekly basis, beginning in 2004 and continuing until he left Venezuela in July 2005. Third, the IJ stated that Kann Vegas's corroborative evidence "did little to shed light on [his] political activities." However, attestations submitted by two officials of First Justice indicate Kann Vegas was an active member of First Justice, was head of Electoral Affairs, participated in numerous demonstrations, and was attacked on several occasions by members of the Bolivarian Circles due to his political beliefs. Finally, the IJ pointed out that Kann Vegas's voluntary return trips from the United States to Venezuela came after some of the incidents of persecution he alleges. Yet, even though these trips occurred after some of Kann Vegas's encounters with the Bolivarian Circles, Kann Vegas stated that he decided to leave Venezuela permanently only after he was shot at in July 2005, after which he received phone calls from the Bolivarian Circles threatening his wife's life and the life of the couple's unborn child, and that the stress resulting from this incident caused his wife nearly to have a miscarriage. To corroborate his wife's near miscarriage, Kann Vegas submitted a medical report from a Venezuelan physician, dated July 26, 2005, stating that Kann Vegas's wife experienced contractions and

11

genital bleeding during her 13th to 14th weeks of pregnancy.

Accordingly, because the reasons given by the IJ for the adverse credibility determination are not supported by the record, the record compels reversal of the adverse credibility determination. See Forgue, 401 F.3d at 1287 (a credibility determination may not be overturned unless the record compels it).

Finally, because the IJ and BIA have not addressed whether Kann Vegas's testimony, if deemed credible and when considered along with the other record evidence, establishes past persecution or a well-founded fear of future persecution, remand as to those issues is the appropriate course.[6] INS v. Orlando Ventura, 537 U.S. 12, 16, 123 S. Ct. 353 (2002) ("[A] court of appeals should remand a case to an agency for a decision of a matter that statutes place primarily in agency hands."); see also Gonzales v. Thomas, 547 U.S. 183, 186, 126 S. Ct. 1613, 1615 (2006) (concluding that remand to agency was required where agency had not considered whether membership in applicant's family constituted a "particular social group"); Antipova v. U.S. Att'y Gen., 392 F.3d 1259, 1266 (11th Cir. 2004) (remanding to allow agency to determine whether applicant suffered past persecution or well-founded fear of future persecution).

For all of these reasons, we grant the Petition, vacate the BIA's decision, and

---

[6]Because the IJ and the BIA also did not address the merits of Kann Vegas's claims for withholding of removal and relief under CAT, we remand for consideration of those claims as well.

remand to the BIA with directions to vacate the IJ's decision and remand for

further proceedings.[7]

**PETITION GRANTED, VACATED, AND REMANDED.**

---

[7]Although we conclude the adverse credibility determination is not supported by substantial evidence, we do not foreclose a reconsideration of credibility on remand. See Kueviakoe v. U.S. Att'y Gen., 567 F.3d 1301, 1306 n.4 (11th Cir. 2009). Rather, we foreclose only an adverse credibility decision based in whole or in part on the reasons relied upon by the government in this appeal. See id. We also note that, notwithstanding that the IJ found that Kann Vegas's return trips to Venezuela were relevant to his credibility, on remand the voluntary return trips may be considered as relevant to whether Kann Vegas had a well-founded fear of future persecution. See De Santamaria v. U.S. Att'y Gen., 525 F.3d 999, 1011 (11th Cir. 2008) ("An asylum applicant's voluntary return to his or her home country is a relevant consideration in determining whether the asylum applicant has a well-founded fear of future persecution.").