[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-14636
Non-Argument Calendar
_____

Agency No. A079-494-556

ALBERTO MUNOZ ERAZO,
BETTY SEPULVEDA SALAZAR,

                                        Petitioners,

versus

U.S. ATTORNEY GENERAL,

                                        Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(February 7, 2013)

Before DUBINA, Chief Judge, JORDAN, and ANDERSON, Circuit Judges.

PER CURIAM:

        Petitioners Alberto Munoz-Erazo and his wife, Betty Sepulveda Salazar,

natives and citizens of Colombia, seek review of the Board of Immigration

Appeals' order of removal and order reversing the immigration judge's grant of asylum. At the removal hearing, Munoz admitted the allegations in the notice to appear, conceded removability, and sought asylum. The IJ granted asylum but never made an explicit finding of removability. On appeal, Munoz asserts that the BIA lacked jurisdiction to independently enter a removal order because the IJ did not make an initial finding of removability. He and his wife also claim that the BIA failed to follow this court's precedent in determining that they had not suffered past persecution and that the BIA incorrectly reviewed the IJ's factual findings and made independent findings of fact. They further contend that the BIA erred in finding that they were able to relocate within Colombia.

Because the BIA set aside the IJ's grant of asylum by exercising plenary review, a standard which its own regulations proscribe, we grant the petition and remand the case to the IJ for further proceedings consistent with this opinion. Furthermore, we hold that the BIA does not have the independent statutory authority to issue an order of removal in the first instance.

## I.

We review jurisdictional questions de novo. *Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006). We also review de novo constitutional claims and questions of law. *Mohammed v. Ashcroft*, 261 F.3d 1244, 1247 (11th Cir. 2001). We review only the BIA's decision, "except to the extent

2

that it expressly adopts the IJ's opinion." *Nreka v. U.S. Att'y Gen.*, 408 F.3d 1361, 1368 (11th Cir. 2005) (internal quotation marks omitted).

## II.

The IJ, following an evidentiary hearing, found that Munoz was credible and that he merited asylum because he had shown past and future persecution. The facts, as found by the immigration judge and as set forth in the exhibits submitted by the parties, are as follows.

Munoz worked as an engineer in Colombia. As an engineer, he directed the construction of highways and had access to equipment that could be used by groups on both sides of the armed struggle in Colombia. *See* Immigration J. Op. at 2.

One of Munoz's highway-construction projects took place in a region of Colombia controlled by the Autodefensas Unidas de Colombia (commonly known as the AUC) and other right-wing paramilitary groups. The two largest guerrilla forces in Colombia—the Fuerzas Armadas Revolucionarias de Colombia (commonly known as the FARC) and the Ejército de Liberación Nacional (commonly known as the ELN)—are left-wing organizations opposed to the AUC and other paramilitary forces. The U.S. Department of State considers the FARC and the ELN "terrorist organizations," and these guerrilla forces are known for numerous atrocities, such as "political killings." 2008 U.S. DEP'T OF STATE

3

COUNTRY REP. ON HUM. RTS. PRACS.: COLOM. 1.  Indeed, in July of 1993, Munoz's brother-in-law was shot and killed by the FARC, apparently for his conservative political views.  *See* Admin. R. at 582.

Like his brother-in-law, Munoz was a political conservative.  He was also a member of the Colombian Association of Engineers, an organization which noted that its members were in "imminent danger of death or threats from the guerrilla groups who accuse them of being collaborators of the auto-defense groups and paramilitary groups."  Immigration J. Op. at 2.

On December 18, 1996, someone shot at and into Munoz's house in Puerto Barrios.  The shooting occurred because Munoz "had conservative roots politically, and this was contrary to the guerrilla groups."  Immigration J. Op. at 5. The FARC demanded that Munoz immediately depart Puerto Barrios because he had ties to a political party.  *See* Admin. R. at 350, 352.  Within two days of the attack, and with his firm's permission, Munoz fled to Cali, where his family resided.  He stayed there for a few weeks, until, again with his firm's permission, he moved to Ibagué in January of 1997.  All went well in Ibagué until October 10, 1998, when his wife received a call from one of the guerrilla groups threatening Munoz's life.

Munoz again fled to Cali. After requesting another transfer, his firm agreed and transferred him to Pereira.  But in May and June of 1999, Munoz received yet

more death threats.  To make matters worse, by then the paramilitary forces also demanded that Munoz disclose information on his construction projects.  Fearing for his life, Munoz complied with these demands.

After Munoz received the death threats in Pereira, his firm transferred him yet again, this time to Puerto López.  His wife and children moved back to Cali without him.  From mid-July of 1999 to January of 2000, Munoz worked in Puerto López, while his family remained in Cali.  He personally received no threats in Puerto López, but in February of 2000, his firm—which had continued to receive calls threatening Munoz—transferred him again.  Munoz moved to El Banco, where he was project director of construction for motorways, and therefore "squarely between the groups that were in opposition to one another." Immigration J. Op. at 4.[1]

In March of 2001, the death threats began again.  By March 22, 2001, the ELN apprised Munoz of his newfound notoriety and told him in several calls that he would be killed or kidnapped:  the ELN now considered him a "military objective" because it believed he was collaborating with the paramilitary forces.  Immigration J. Op. at 3–4.[2]

---

[1] At some point, additional death threats from the ELN forced Munoz to move from San Juan de Pasto to a location near Bogotá.  Immigration J. Op. at 5.  It is not clear when Munoz moved to San Juan de Pasto, or when the threats occurred, but this uncertainty does not affect the BIA's refusal to apply the clear error standard on review.

[2] As noted earlier, Munoz told the paramilitary forces about the projects that he was working on because they "told him to" disclose the information. The IJ found that Munoz acted

5

By now at wit's end, Munoz filed a police report on March 28, 2001.  He soon quit his job, moved to Cali, and decided to flee Colombia.  He left in April for the United States, and his family departed in May.  They all traveled on tourist visas, which soon expired.  Munoz did not return to Colombia and eventually sought asylum.

The IJ found Munoz credible, explaining that he "made every effort to testify honestly and accurately to the best of his recollection."  Immigration J. Op. at 6–7.  Given Munoz's harrowing history, the IJ also found—not surprisingly—that Munoz had shown past and future persecution and therefore merited political asylum.

On appeal, the BIA reversed the IJ's grant of asylum, in part because it believed that Munoz had not shown past persecution.  Though the BIA said that it was reviewing the IJ's factual determinations for "clear error," it did not really perform any deferential review.  Instead, it reviewed the record de novo to reach its own findings about past and future persecution.

### III.

### A.

When the government sought to remove Munoz as an overstay, he sought asylum as a refugee.  *See* 8 U.S.C. § 1101(a)(42)(A) (defining "refugee" as "any person who is outside any country of such person's nationality . . . and who is

---

in the way one might expect of someone "threatened by various superior force[s]." Immigration J. Op. at 4.

6

unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion"). Past persecution does not require actual physical injury; for example, attempted murder, if proven, will suffice. *See Sanz de Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1008-09 (11th Cir. 2008) (stating that past persecution does not require serious physical injury "where the petitioner demonstrates repeated threats combined with other forms of severe mistreatment"). Given the facts outlined above—a shooting of his house followed by persistent death threats over a period of years in different cities by opposing military groups in Colombia's armed struggle—Munoz asserted that he had faced persecution in Colombia and deserved asylum. The IJ agreed.

The BIA took a different view and set aside the grant of asylum, finding that Munoz had "not sufficiently demonstrate[d] past persecution or a well-founded fear of future persecution." BIA Op. at 3. The BIA, however, did so by reshaping the facts in violation of its own limitations on appellate review.

Under its own regulations, the BIA cannot "engage in de novo review of findings of fact determined by an immigration judge." 8 C.F.R. § 1003.1(d)(3)(i). Except for the ability to take "administrative notice of commonly known facts," the BIA cannot "engage in factfinding in the course of deciding appeals." *Id.* § 1003.1(d)(3)(iv). Yet, the BIA did exactly that.

For instance, in its opinion, the BIA stated that the 1996 shooting could not show past persecution because Munoz "stated that he did not know who attacked him." BIA Op. at 3. However, the IJ found that Munoz's house was targeted because he "had conservative roots politically, and this was contrary to the guerrilla groups." Immigration J. Op. at 5. This finding by the IJ at the very least strongly implies that the guerrilla groups attacked Munoz's house. The BIA, without acknowledging or mentioning this language from the IJ's order, concluded that there was no evidence that guerrilla groups shot at Munoz's house. The BIA, moreover, spun the limited evidence it chose to discuss. The BIA concluded, by citing to Munoz's sworn statement, that he did not know who attacked his house. To be sure, in his statement, Munoz acknowledged that he did not know who attacked his house *at the time of the shooting*, but, in the same sworn statement, explained that he later discovered that the FARC was responsible. Admin. R. at 540–41. Thus, the BIA's substituted factual finding itself is not correct.[3]

The BIA performed similar analytical contortions elsewhere. By law, where an alien shows past persecution there is a presumption that the alien has a well-founded fear of persecution. *See Arboleda v. U.S. Att'y Gen.*, 434 F.3d 1220, 1223 (11th Cir. 2006) (per curiam) ("A showing of past persecution creates a presumption of a 'well-

---

[3] The IJ noted several times that Munoz believed the threats and attacks came from the guerrilla groups. *See* Immigration J. Op. at 2, 3, 4, 5, 7. The BIA's opinion is devoid of any reference to these passages.

8

founded fear' subject to rebuttal . . . .") (internal quotation marks omitted).  The government can overcome this presumption, however, if it can show by a preponderance of the evidence that the alien "could avoid future persecution by relocating to another part of the applicant's country of nationality."  8 C.F.R. § 208.13(b)(1)(i)(B).  *See also Antipova v. U.S. Att'y Gen.*, 392 F.3d 1259, 1265 (11th Cir. 2004) ("[I]f an applicant has established past persecution, the [government] can overcome the presumption of future persecution by showing that she could avoid future threats by relocating within the country . . . .").  The government must also show that it would be reasonable, "under all the circumstances," to "expect the applicant" to relocate. *See* 8 C.F.R. § 208.13(b)(2)(ii).

Here, the BIA held that Munoz "was able to live and work unharmed and without threats in Puerto López and in Cali."  BIA Op. at 4.  The IJ, however, apparently made no factual finding about relocation in the asylum context.  The BIA has recognized that, when an IJ makes no decision on relocation, it must remand the case to the IJ because of its "limited fact-finding abilities." *See Matter of D-I-M-*, 24 I. & N. Dec. 448, 451 (BIA 2008).  "If the BIA wanted specific factual findings on these issues, then the governing regulations required it to remand the case to the IJ instead of making its own factual determinations."  *Rodriguez v. Holder*, 683 F.3d 1164, 1174

9

(9th Cir. 2012).  When it concluded that Munoz could relocate, the BIA ignored the limitations placed on its review.[4]

The BIA's relocation decision, furthermore, is lacking on its own terms.  As noted, the government must show that it is reasonable to expect the alien to relocate.  This reasonableness analysis requires the consideration of several factors, like the administrative, economic, or judicial infrastructure of the region, and the social and cultural constraints on relocation. *See* 8 C.F.R. § 208.13(b)(3).  The IJ made no factual findings on these matters, and the BIA did not mention them either.  The BIA's analysis, therefore, "is incomplete," and, because it failed to apply the proper factors, it committed "reversible error."  *Arboleda*, 434 F.3d at 1226.

The BIA's error as to relocation is further compounded by three facts.  First, although Munoz lived in Cali without death threats, he lived there for only a few weeks (from mid-December 1996 to January 1997).  That span is hardly a long one.  Second, Munoz lived in Puerto López while his family lived in Cali.  Familial ties are a consideration that should be taken into account when deciding the reasonableness of relocation, yet the BIA ignored this fact in its threadbare analysis.  *See Sanchez v. U.S.*

---

[4] To be fair, the IJ did appear at one point to find that Munoz could relocate for "withholding of removal" purposes.  That being said, the IJ made no similar decision about asylum, and his language in the "withholding of removal" section is unclear.  *See* Immigration J. Op. at 10 ("The Court does not find that the respondent's application for withholding is clearly approvable because . . . the Court does not find that it is more likely than not that the respondent would be tortured if he was returned to his country simply based upon the fact that there were areas that he did go to that he did not receive calls in.").  As explained in the text, if the BIA thought that more findings were needed, it should have remanded the matter to the IJ.

*Att'y Gen.*, 492 F.3d 1223, 1238 n.14 (11th Cir. 2007) ("In assessing reasonableness, the IJ should consider . . . social and familial ties."). Third, and maybe most important, Munoz received threats while residing in not one, not two, not three, but four different cities (Puerto Barrios, Ibagué, Pereira, and El Banco). It is difficult to see how the BIA could have thought, on purportedly deferential review, that things would be better for Munoz if he moved to a fifth or sixth city.

The BIA committed one final glaring error as factfinder when it concluded that Munoz had not shown a well-founded fear of future persecution. As we have said, a well-founded fear of future persecution can be established by a reasonable possibility of personal persecution that cannot be avoided by relocating within the subject country. *See id.* at 1232; 8 C.F.R. § 208.13(b). *See also Mohammed v. U.S. Att'y Gen.*, 547 F.3d 1340, 1351 (11th Cir. 2008) (Wilson, J., dissenting). The alien's fear of persecution is well-founded if it is "subjectively genuine and objectively reasonable." *Sanz de Santamaria*, 525 F.3d at 1007. The IJ explicitly found that Munoz "had satisfied the standards set out in the refugee definition [in] *Fonseca*." Immigration J. Op. at 10. That is a roundabout way of saying that the IJ found that Munoz had a well-founded fear of persecution, for *INS v. Cardoza-Fonseca*, 480 U.S. 421, 107 S. Ct. 1207 (1987), is *the* case that defines a well-founded fear of future persecution. Indeed, the Supreme Court emphasized that "well-founded fear of persecution" is not a stringent standard: "There is simply no room . . . for concluding

11

that because an applicant only has a 10% chance of being shot, tortured, or otherwise persecuted, that he or she has no 'well-founded fear' of the event happening." *Cardoza-Fonseca*, 480 U.S. at 440, 107 S. Ct. at 1217.

The BIA nonetheless disregarded the IJ's "well-founded fear of persecution" finding, decided that the record did not "sufficiently reflect that the guerrilla groups have a continued interest in" Munoz, and concluded that there was no reasonable possibility of personal persecution. BIA Op. at 4.  The BIA never explained why it could scour the record to engage in such factfinding.  Nor did it say why, given the IJ's finding, it could decide that Munoz had not shown a reasonable possibility of personal persecution.

The BIA's newfound interest in factfinding has not gone unnoticed by the federal courts.  Indeed, on January 4, 2013, this Court issued an opinion in *Zhu v. United States Atty. General*, 2013 WL 42998 (11th Cir. Jan. 4, 2013), vacating and remanding a BIA decision because the BIA engaged in unauthorized factfinding.  *See id.* at *4 ("the BIA can review the IJ's factual findings, including predictions about the possibility of future events, only for clear error").

In this case, as in *Zhu*, the BIA, contrary to its own regulations, engaged in de novo review of the IJ's factual findings.  This was error.

12

**B.**

The BIA also issued an order of removal in the first instance.  That, too, was error.  The BIA does not have independent statutory authority to issue an order of removal in the first instance.  *See* 8 U.S.C. § 1229a(a)(1) (it is the IJ who "shall conduct proceedings for deciding the inadmissibility or deportability of an alien"); 8 U.S.C. § 1229a(c)(1)(A) ("[a]t the conclusion of the [removal] proceeding the [IJ] shall decide whether an alien is removable from the United States").  *See also Rhodes-Bradford v. Keisler*, 507 F.3d 77, 81 (2d Cir. 2007); *Sosa-Valenzuela v. Gonzales*, 483 F.3d 1140, 1145 (10th Cir. 2007); *James v. Gonzales*, 464 F.3d 505, 514 (5th Cir. 2006); *In re I-S & C-S-*, 24 I. & N. Dec. 432, 434 (BIA 2008).

**IV.**

For the aforementioned reasons, we grant the petition for review and remand this case for further proceedings consistent with this opinion and consistent with our recent decision in *Zhu*.

**PETITION GRANTED, and CASE REMANDED.**

13